Malia Irene PATTON, Plaintiff,

v.

The UNITED STATES of America, Defendant.

Civ. A. No. 9722.

United States District Court
W. D. Pennsylvania.

Nov. 30, 1955.

280

Kennedy Smith, Sidney J. Watts (of
Baker, Watts & Woods), Pittsburgh,
Pa., for plaintiff.

John W. McIlvaine, U. S. Atty., Dail
E. Sloan, Asst. U. S. Atty., Pittsburgh,
Pa., for defendant.

MARSH, District Judge.

1. Malia Irene Patton, plaintiff, is
sole owner of the property located at 140
The Boulevard Street, Pittsburgh, Pennsylvania. Prior to 1951, the said property was owned by Ernest F. M. Patton
and Malia Irene Patton as tenants by
the entireties. Ernest F. M. Patton died
on February 22, 1954.

2. Plaintiff, acting in her own behalf
and as attorney-in-fact for Ernest F. M.
Patton, executed an agreement with the
National Housing Agency, an agency of
the United States of America, dated November 29, 1943, whereby the said Pattons leased the property aforesaid to
the United States of America for a period of seven years, beginning December
8, 1943 and ending December 7, 1950.

3. The lease was on the printed form
prepared by the Federal Housing Administration. The lease provided for the
payment of an annual rental of $40, plus
assumption of a monthly mortgage payment of $65 during the term of the lease.

4. The aforesaid lease was a part of the program to aid the war effort, whereby the Government, using public funds, leased and converted single family residential properties into multiple apartment units, and, after conversion, sublet to war workers the additional dwelling units so created. This program was advertised and plaintiff and her husband read some of the advertising material.

5. Pursuant to the aforesaid lease, certain plans and specifications were submitted to the plaintiff for her approval in connection with the conversion of the property aforesaid into a two-family dwelling.

6. The Pattons consented to the conversion as set forth in the plans and specifications.

7. The conversion of the property was performed in accordance with the said plans and specifications, plus minor reasonable variations, and considerable repair; the work was completed in the Fall of 1944. Additional contracts were awarded as latent defects were found during the course of the conversion.

8. After the property was converted, subtenants were put in possession of the first floor apartment at a rental of $65 per month and the second-third floor apartment at a rental of $68 per month, and during the term of the lease, the United States, as lessee sublet the newly created accommodations to various tenants.

9. The lease contained the following covenant with respect to maintenance of the premises:

"9. The Government, during the term of this lease, shall take good care of the Premises, and may make any and all repairs, both interior and exterior, necessary to keep the Premises in good order, condition, and repair, without the consent or approval of the Lessor. Upon the surrender of the Premises by the Government, it shall redecorate and/or repaint the vacant portion of the interior thereof."

10. The plaintiff and her husband occupied the first floor apartment as subtenants of defendant from the Fall of 1948 to the termination of the lease, during which time Mr. Patton, his son, and son-in-law made extensive repairs, but the cost thereof was not proved.

11. On December 7, 1950 the defendant vacated the demised premises and the plaintiff and her husband accepted possession as of that date.

12. At the time of the execution of the lease, the dwelling on the premises was an eleven-room brick structure with front and rear porches. A 2-car garage was located in the rear adjacent to an alley which extended from The Boulevard Street to another alley which ran along the rear of the property. The house and garage were built about the year 1910 and had been acquired by the Pattons in 1930.

13. At the commencement of the lease, the dwelling was in good structural condition, but it needed paint on the exterior and considerable repair on the interior due primarily to deterioration from age.

At that time the 2-car garage was in a fair condition and usable but in need of exterior paint.

14. During the term of the lease, the garage was not used to accommodate motor vehicles by any of the subtenants.

15. During the term of the lease, the defendant expended the sum of $2,482.78 for necessary repairs.

16. During the term of the lease very little in the way of repairs was done by the defendant to keep the garage wind and water tight; it was subject to vandalism and deterioration and fell into a dilapidated state. By the Fall of 1948 all the windows were out, the doors were jammed, part of the siding was gone, the internal panelling was dislodged and holes existed in the roof and floor. The shrubbery had grown up and encroached on the driveway in such a manner as to block access to the garage from the alley.

17. The owners informed the defendant a short time prior to termination of the lease that they and the subtenants in the second floor apartment would be willing to vacate the premises in order to permit internal redecoration, but were informed by the defendant's representative that no redecoration would be done.

18. The items in need of repair at the termination of the lease or during the term thereof, and the cost of repairs required by the covenant are as follows:

A. Garage $2500.00

B. Windows:

    (1) weatherstripping 30 windows at $12.00 each   $ 360.00

    (2) removing mastic and adjusting windows on 3 floors   162.50   522.50

C. Replace tile in second floor bathroom   180.00

D. Two steel pipe stanchions in basement   70.00

E. Front door bell assembly   25.00

F. Repair of brick piers front and back porch   164.50

G. Hearth tile in living room   40.00

H. Decoration and painting of interior:

    (1) First Floor

        (a) Dining Room
           1. papering   53.25
           2. painting woodwork   60.00
           3. painting floor   37.80

        (b) Living Room
           1. papering   50.00
           2. painting woodwork   45.00
           3. painting floor   30.45

        (c) Kitchen
           1. painting walls   68.16
           2. painting woodwork   45.00

        (d) Music Room
           1. papering   18.00
           2. painting woodwork   30.00
           3. painting floor   13.50

        (e) Vestibule and hall
           1. papering   76.00
           2. painting woodwork   150.00

        (f) Rear Bedroom and Bathroom No proof of damages

    (2) Second Floor

        (a) Rear Room— right side
           1. papering   58.00
           2. painting woodwork   60.00
           3. painting floor   40.80

        (b) Rear Room— left side
           1. papering   32.00
           2. paint woodwork   30.00

        (c) Bathroom
           1. painting   14.40
           2. paint woodwork   22.50

        (d) Front Room— left side
           1. papering   38.00
           2. paint woodwork   45.00
           3. paint floor   19.80

        (e) Front Room— right side
           1. papering   50.00
           2. painting woodwork   60.00
           3. painting floor   31.50

(f) Hallway
1. papering — 54.00
2. paint woodwork — 90.00
3. paint floor — 20.95

(3) Third Floor

(a) Rear Room
1. papering — 44.00
2. paint woodwork — 45.00
3. paint floor — 27.75

(b) Front Room
1. papering — 44.00
2. painting woodwork — 45.00
3. paint floor — 27.75

(c) Other Room
1. papering — 28.00
2. paint woodwork — 22.50
3. paint floor — 14.00

Total — $1642.11

20. Window blinds which were in place at the beginning of the term were removed. The reasonable cost of replacement as of December 7, 1950 was $165.

21. Two Taylor gas burners which were in place at the beginning of the term were removed. The reasonable cost of replacement as of December 7, 1950 was $100.

### Discussion.

■ As this action is based on a lease with the United States, the federal law is applicable, although we may look to the general law for guidance in the absence of precedent. Girard Trust Co. v. United States, 3 Cir., 1947, 161 F.2d 159.

■ Paragraph 9 of the lease, quoted in Finding 9, embodies the covenant to repair and it must determine the obligation between the parties. United States v. Bostwick, 1876, 94 U.S. 53, 24 L.Ed. 65. As distinguished from the implied covenant in the Bostwick case, the covenant here is a specific covenant. Cf. Girard Trust case, supra. If there arose therefrom contractual duties owed to plaintiff which were breached by defendant, another question is whether damages were sufficiently proved.

· Plaintiff contends that Paragraph 9 of the lease placed an affirmative duty to repair on lessee, while defendant takes the position that it provided merely for a permissive right to repair.

■■ There is in every lease, in the absence of language to the contrary, an implied covenant on the part of the lessee to surrender the premises to the lessor upon the expiration of the term in substantially the same condition as when the lessee took possession, normal wear and tear excepted. 51 C.J.S., Landlord and Tenant § 408. The tenant must make fair and tenantable repairs which will prevent decay and delapidation, such as keeping the buildings wind and water tight, and such as reasonable care will dictate; but he is not liable for ordinary wear and tear. See 16 R.C.L. § 603 at page 1086; American Law of Property, vol. 1, § 3.78 at page 347.

Does the language of Paragraph 9 impose any higher duty upon lessee? We think it does although we have not been referred to any case in point.

■ In construing the language of Paragraph 9, we take into consideration that the Government was advertising for living accommodations for war workers to aid the war effort; also that plaintiff's house and garage were construced about 1910; that prior to the date of the lease in 1943, they had not had the best of care, and consequently had suffered considerably from wear and tear due to the passage of time. Also we look at the object and intent of the parties as gathered from the four corners of the lease and find that the defendant obtained the right to convert the house into a two-family dwelling and recondition it; that these objectives were accomplished after considerable work and

were not completed until the Fall of 1944.

In the light of these considerations, we think the language in Paragraph 9 was intended to mean something more than the implied covenant aforementioned.

██ The lease was prepared by lessee; the language in Paragraph 9 is its language; therein it agreed to "take good care of the Premises". No exception is made for ordinary wear and tear.[1] It specifically agreed to repaint and redecorate the vacant portion at the end of the term. In view of the fact that defendant reconverted and reconditioned the premises pursuant to the lease, the covenant is equivalent to an undertaking on its part to put and keep the premises in reasonably good order, condition and repair, as distinguished from a merely tenantable condition. It does not require defendant to make substantial and expensive structural improvements or make renewals and replacements which will last a lifetime, but the language used by lessee was certainly intended to impose a greater obligation upon it than would have been implied if nothing were written.[2]

The alleged permissive language used does not detract from this construction, rather, we think, it reaffirms the Government's covenant "to take good care of the Premises * * * both interior and exterior", by providing that it may do so "without the consent or approval of the Lessor".

The last sentence of the covenant expresses a particular duty which is included in the general duty to "take good care", viz., upon surrender of the premises the Government bound itself to "redecorate and/or repaint the vacant portion of the interior thereof", and we interpolate, if it were in need thereof.[3]

Theoretically the premises would be vacant at the end of the term, but to hypothesize, we think the scrivener was zealous to protect the Government against liability, if for some reason a subtenant might refuse to permit an entry for these purposes prior to the end of the term or thereafter.

Read as a whole then, it seems that the Government, after expressly agreeing to take good care of the premises, has sought to render performance by its agents as free from inconvenience and liability as possible, but without limiting or restricting its obligations.

██ There is ample proof that the duty to keep in repair was breached in the particulars set out in the findings of fact.

As to certain items claimed which are not allowed, plaintiff has failed to meet her burden of proof as to the necessity of repair or the cost thereof.

██ Her claims for the cost of plaster for the several rooms and halls and of a new roof are disallowed because they are in the nature of permanent replacements or improvements rather than repair as contemplated by the covenant. The cost of patching certain areas with needed plaster and of replacing broken slate as of the termination of the lease, which may have been allowed, were not proved. Cf. Keroes v. Richards, supra note 2.

██ Considerable difficulty was encountered in determining whether the costs of repair which are allowed in the findings of fact were proved with sufficient certainty. Plaintiff's proof in this respect rests on the testimony of the witness Staude. After qualifying him as an expert on the cost of construction and repairs to structures such

1. In American Law of Property, vol. 1, § 3.79 at page 350, it is said "If the lessee covenants to repair without exception, then he must repair, whatever the cause", citing Arnold-Evans Co. v. Hardung, 132 Wash. 426, 232 P. 290, 45 A.L.R. 9.

2. Cf. Girard Trust Co. v. United States, supra; Keroes v. Richards, 1906, 28 App. Cas.D.C. 310, 8 Ann.Cas. 575; American Law of Property, vol. 1, § 3.79; 45 A.L.R. 17 et seq.; 16 R.C.L. § 608.

3. Cf. 16 R.C.L. § 608 at page 1092.

as the premises in question, plaintiff proceeded to elicit from him the cost of repair of the garage and of various items in the house. The figures given by the witness represented his opinion of the costs of repairs as of about 1950, based on the testimony of Mrs. Patton and others as to the condition of the premises. Although the admissibility of the evidence is subject to some doubt, we think that it is competent to the issue of damages and certainly the best evidence in the circumstances.

It is well established that, although a reasonable basis for determining the amount of damages must exist, the exact amount of the damages need not be proved in order to permit a recovery where the best proof possible has been adduced. Eastman Kodak Co. v. Southern Photo Materials Co., 1927, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684.

It is our opinion that the testimony of the condition of the premises in 1948 to 1950, inclusive, together with that of the expert Staude affords a reasonable basis for the computation of damages in keeping with the rule.

▮▮▮ Plaintiff has been allowed the replacement cost of window shades and of two Taylor burners which were present at the inception of the lease. An examination of the lease and specifications forming the agreement between plaintiff and defendant does not disclose any authority from the lessor to the defendant to remove said items. The removal of those items together with the subsequent failure to replace them constituted waste on the part of the defendant for which it is liable. See 51 C.J.S., Landlord and Tenant, § 261; American Law of Property, vol. V, § 20.7.

Conclusions of Law.

▮▮▮ 1. The court has jurisdiction of this claim under the Tucker Act, 28 U.S.C.A. § 1346(a) (2).

2. By paragraph 9 of the lease executed by the plaintiff and defendant, the defendant obligated itself to keep the house and garage at 140 The Boulevard, Pittsburgh, Pennsylvania, in a state of good repair, which obligation it breached during the course of the lease and continued to breach until its termination.

3. As a direct result of the breached obligation, the plaintiff has suffered damages in the amount of $5,144.11.

4. As a direct result of the waste committed by the defendant in removing and failing to replace window shades and Taylor burners, the plaintiff has suffered damages in the amount of $265.

5. The plaintiff is entitled to recover the sum of $5,409.11 and judgment in her favor should be entered in that amount with costs as prescribed by § 2412(b), Title 28 U.S.C.